**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DAICHENA THOMAS, *et al.*,

      Plaintiffs,

  vs.

CLARK COUNTY, *et al.*,

      Defendants.

Case No.: 2:22-cv-00899-GMN-NJK

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Pending before the Court is the Motion to Dismiss, (ECF No. 148), filed by Defendant Wellpath, LLC.  Plaintiffs Daichena Thomas, individually and as the personal representative of the estate of Palmer Pierce Joseph Wright, Dana Thomas, Devontay Thomas, Delon Armstrong, J.W., and Germaine Carmena filed a Response, (ECF No. 157), to which Wellpath filed a Reply, (ECF No.158).

Also pending before the Court is the Motion for Summary Judgment ("MSJ"), (ECF No. 79), filed by Defendant Las Vegas Metropolitan Police Department ("LVMPD").[1]  Further pending before the Court is the Motion for Summary Judgment, (ECF No. 80), filed by Defendants Wellpath LLC, Correct Care Solutions, LLC, Jay Marcos, Earl D. Salviejo, Tanja Wasielewski, Horace Tadeo, Larry Williamson, Heather Hanash, David Oliphant, Alexia Mahoney, Becky Christensen, Ray Martin Montenegro, and K. Purcell (collectively the "Wellpath Defendants").  Plaintiff filed an omnibus Response to both Motions for Summary

---

[1] LVMPD filed a Notice of Supplemental Authority, (ECF No. 167).  Per the Local Rules "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause." LR 7-2(g).  The Court "may strike supplemental filings made without leave of court." *Id.*  LVMPD did not move for leave to file this supplemental authority.  The Court will nevertheless consider the supplemental authority submitted, as discussed further below, but it admonishes LVMPD to read and comply with the Local Rules moving forward.

Judgment, (ECF No. 114).  LVMPD filed a Reply, (ECF No. 125), as did the Wellpath Defendants, (ECF No. 129). Plaintiffs also filed a Motion for Leave to File Excess Pages to their Omnibus Response, (ECF No. 115), to which the Wellpath Defendants responded, (ECF No. 117), and Plaintiffs replied (ECF No. 118).[2]

## I.    BACKGROUND

This case arises out of the death of Palmer Wright at the age of 35 after he was incarcerated at the Clark County Detention Center ("CCDC") in 2021.  On April 7, 2021, Wright was arrested by LVMPD and taken to CCDC. (Decl. Arrest, Ex. A to LVMPD MSJ, ECF No. 79-1).  Approximately 36 hours before he was arrested, Wright was discharged from Mountain View Hospital where he had been hospitalized, sometimes in the Intensive Care Unit, for five days. (Mtn. View Hosp. Records, Ex. E to LVMPD MSJ, ECF No. 79-5).  Wright's hospitalization was his second admission at Mountain View Hospital since February 22, 2021, for heart failure. (*Id.*).  After his second hospitalization, Wright's discharge diagnosis included acute systolic/diastolic congestive heart failure ("CHF") with a severely low ejection fraction of 10–15%. (April 1 Medical Record at 9, Ex. C to Wellpath MSJ, ECF No. 80-3).  He was prescribed five medications upon discharge. (*Id.*).

---

[2] Plaintiffs filed their Motion for Leave to File Excess Pages after filing their Response.  Motions for summary judgment and responses are limited to 30 pages. LR 7-3(a).  "The court looks with disfavor on motions to exceed page limits, so permission to do so will not be routinely granted.  A motion to file a brief that exceeds these page limits will be granted only upon a showing of good cause." LR 7-3(c).  Here, Plaintiffs submitted a 102-page Response.  Plaintiffs argue that this Response is only 40 pages overlength because they should be allowed 60 pages for their omnibus Response to both MSJs.  They further explain that this Response required additional pages because of the volume of facts, depositions, experts, documentation of official policies, and Defendants. While Plaintiffs may have shown good cause to file some amount of additional pages, particularly given it was a combined Response to both MSJs, the Court does not agree that such volume of information necessitated a 102-page Response—a more succinct distillation of the arguments was possible and would have more effectively apprised the Court of the necessary information without requiring it to search through 102 pages of information. However, given the timing and procedural posture of this case (including a lengthy stay due to Wellpath's bankruptcy), the Court declines to strike the overlength briefs and will consider the substance of the Response in this one instance.  However, Plaintiffs' counsel is admonished that such a lengthy filing should not be filed and will not be considered in the future.

At the time of Wright's arrest, Clark County had contracted with Wellpath, a private company, to provide medical services to detainees at CCDC. (Wellpath Contract, Ex. Y to LVMPD MSJ, ECF No. 79-25).  After his arrest on April 7, 2021, Wright was placed under Wellpath's medical care at CCDC. (Booking Voucher, Ex. D to Wellpath MSJ, ECF No. 80-4); (Wellpath Contract, Ex. Y to LVMPD MSJ, ECF No. 79-25).  Upon arriving at CCDC, Wright went through several medical screenings.  He began with a pre-screening by a Wellpath EMT who cleared him to be booked. (Pre-screening, Ex. L to LVMPD MSJ, ECF No. 79-12).[3]  He was then seen by Nurse Tanja Wasielewski for a receiving screening. (Receiving Screening, Ex. M to LVMPD MSJ, ECF No. 79-13).  The notes from the screening indicated that Wright had acute systolic (congestive) heart failure and respiratory failure with hypoxia, and that he had heart failure that was treated at Mountain View Hospital. (*Id.* at 4).  At that screening, the nurse prepared a request for information ("ROI") to be sent to Mountain View Hospital to obtain Wright's hospitalization records. (ROI, Ex. N to LVMPD MSJ, ECF No. 79-14).  The ROI listed the incorrect birthdate for Wright—one day later than his actual birthday. (*Id.*).  Both Wright and Wasielewski signed the ROI. (*Id.*).  Following the screening, Wasielewski completed and e-signed a Staff Referral Form, referring Wright for "routine" care with a mid-level provider. (Med. Records at LVMPD000091, Ex. 13 to Resp. Exs., ECF No. 107-13).  On that form, Wasielewski indicated that Wright had been seen at Mountain View Hospital the day before and "given several new medications which he does not know." (*Id.*).  She further noted that Wright had several low blood pressure readings, felt lightheaded, and had asthma. (*Id.*).

The same day, nurse practitioner Earl Salviejo reviewed the screening. (Provider Progress Notes at 2, Ex. Y to Wellpath MSJ, ECF No. 80-25).  She noted that Wright had a known medical history of heart and respiratory failure and reported being seen at Mountain View Hospital yesterday where he was prescribed with multiple medications. (*Id.*).  Salviejo

---

[3] The pre-screening form listed Wright's correct birthdate. (*Id.*).

further wrote that Wright was a "poor historian" and was "unable to provide info regarding current condition." (*Id.*). She referred him for medical management, noted that there were no active/acute medical findings, and wrote that she instructed Wright to alert medical staff if he had worsening symptoms or any change in status. (*Id.*).

For approximately one week after being booked, Wright was placed in the quarantine unit of CCDC with Jesse Butler, the man he was arrested with. (Butler Dep. 16:11–17:3, Ex. 8 to Resp. Exs., ECF No. 107-8). Butler testified that, during the time in quarantine, Wright complained of medical symptoms including chest pain, trouble breathing, swollen ankles, and general weakness. (*Id.* 30:25–31:9). Butler further stated that he witnessed Wright telling both corrections officers and Wellpath staff "a bunch of different times" that he needed his heart medication. (*Id.* 31:10–32:9).

On April 8, Wright called his girlfriend Zina Essix. (April 8 Recording 8028736, Ex. 12 to Resp. Exs., ECF No. 107-12, manual filing). On that call, Wright told Essix his feet were swollen, he was not receiving medical attention from Wellpath and stated "they are treating me like shit right now." (*Id.*). The next day, Wellpath nurse Horace Tadeo completed a Progress Note that indicated Wright was seen for low blood pressure. (Medical Records at LVMPD000108–09, Ex. 13 to Resp. Exs.). Tadeo noted that the patient had no complaints but did say he was supposed to be taking "a water pill and steroids." (*Id.*). Tadeo made no notes regarding the status of the ROI, and ordered continued care according to the current plan with follow up as scheduled. (*Id.*).

The following day on April 10, Wright again called Essix and reported that his "feet are hurting so bad," and that "all [Wellpath personnel] do is every five hours they come and check my blood pressure." (April 10 Recording 8041386, Ex. 12 to Resp. Exs.). On April 11, Physician Assistant David Oliphant ordered an additional asthma inhaler for Wright for shortness of breath. (Medical Record at LVMPD000097, Ex. 13 to Resp. Exs.). Oliphant also

made a note in Wright's chart that Wright had reported newly diagnosed cardiac and respiratory failure and said, "please review records if available." (Medical Notes at 000002, Ex. 14 to Resp. Exs., ECF No. 107-14).  Oliphant also completed a Provider Progress notes form that day which said Wright "was unable to provide any further information" with regards to his recent diagnosis of a "heart problem." (Medical Records at LVMPD000115–16, Ex. 13 to Resp. Exs.).  The notes further state that Wright reported feeling "a lot better" since being booked and denied chest pain or shortness of breath. (*Id.*).  The Provider Progress Notes state that "an ROI has been obtained and sent, but no records are available for review at this time." (*Id.* at LVMPD000116).  They also include a note entered by Oliphant stating: "Provider Sick Call visit schedule for ROI documentation review." (*Id.*).  Lastly, Oliphant wrote that he instructed Wright to notify the staff immediately of any new and/or worsening of symptoms." (*Id.* at LVMPD000117).  The same day he was seen by Oliphant, Wright again called Essix and asked her to read of two off his CHF medications, which she read as Valsartan 40mg and Furosemide 20mg. (April 11 Recording 8052100, Ex. 12 to Resp. Exs.).

On April 12, Wellpath received a faxed Response to the April 7 ROI to Mountain View Hospital which stated: "UNABLE TO LOCATE THE PATIENT." (Medical Records at LVMPD000100, Ex. 13 to Resp. Exs.).  There is no record of Wright being seen by Wellpath personnel on April 12 or 13. (*See generally id.*).

On April 14, Wellpath Medical Director Larry Williamson reviewed Wright's medical chart because of the response to the ROI. (Medical Records at LVMPD000114, Ex. 13 to Resp. Exs.); (Williamson Dep. at 48:16–20, 54:4–17, Ex. 15 to Resp. Exs., ECF No. 107-15).  Williamson did not make any recommendations about Wright's medical treatment and did not order that anything be done to follow up on the ROI. (Medical Records at LVMPD000114, Ex. 13 to Resp. Exs.).

On April 15, nurse Victor Zaghen wrote a medical note in Wright's electronic chart stating that Wright "Self reports was taking Valsartan 40mg qd and Furosemide 20mg qud." (Medical Notes at 0000003, Ex. 14 to Resp. Exs.). Zaghen filled out a second ROI form requesting "diagnosis plan/treatment" for 2021 or most recent visit." (Medical Records at LVMPD000072, Ex. 13 to Resp. Exs.). This ROI again listed the incorrect birthdate for Wright. (*Id.*). The ROI is stamped "FAXED" on April 15, but there is no evidence in the record that Wellpath received a response. The same day, Wright submitted a kite stating, "I need my medication for my heart I need to talk back to the doctor ASAP hard to breath [sic] when I go to sleep." April 15 Kite, Ex. 18 to Resp. Exs., ECF No. 107-18). In the staff notes section, Wellpath nurse Jon Lau wrote that Wright was seen on April 11. (*Id.*); (Lau Dep. 60:19–21, Ex. 20 to Resp. Exs., ECF No. 107-20). Lau testified that he did not see Wright and took no further action in response to the kite. (*Id.* 65:24–66:1, 99:7–25).

Also on April 15, Wright called Felicia Trimble and told her that his face was swelling up. (April 15 Recording, Ex. 12 to Resp. Exs.). He also spoke to her twice the next day and told her that he could nott breathe, he was "gasping for air," that it hurt to breathe, his stomach was bloated, and he needed his water pill. (April 16 Recordings 8107945 and 8107945, Ex. 12 to Resp. Exs.). The day after, Essix called the CCDC switchboard operator and stated that Wright has heart problems and needed his medicine. (April 17 Recording, Ex. T to LVMPD MSJ, Manual Filing). She read Wright's entire medication list with dosages to the operator and spelled out each drug. (*Id.*). The operator placed Essix on hold and called Wellpath. He spoke to someone who identified themselves as "Jaz" and relayed the information Essix provided. Jaz responded, "alrighty, I'll place a note in his chart." (*Id.*). There is no evidence that the information provided was placed in Wright's Wellpath chart. (*See generally* Medical Notes, Ex. 14 to Resp. Exs.); (Medical Record, Ex. 13 to Resp. to Exs.).

Wright and Essix also spoke on April 17, when Wright again told Essix that he was extremely bloated, unable to eat, and needed his water pill. (April 17 Essix Recording 8116015, Ex. 12 to Resp. Exs.). He stated that he thought it was his heart because he couldn't breathe at night and that he had not "ever felt like this before." (*Id.*). He referenced two Wellpath nurses coming to his unit who were not listening to his complaints, and said he was going to send another kite. (*Id.*).

The same day, Wright submitted a second kite stating: "I need to talk to a Doctor it's been 2 weeks in I have not had my water pill are [sic] my heart pill I can't breath [sic] when I go to sleep I need help I need help nobodys [sic] helping me." (April 17 Kite, Ex. 23 to Resp. Esx., ECF No. 107-23). This kite was triaged as an emergency (Category 1) on April 17 at 8:00pm. (*Id.*). An unidentified LPN wrote: "Sick call for heart medication and complications. [Complains of] retaining water and [shortness of breath]." (*Id.*). The LPN did not note Wright's pulse or blood pressure. (*Id.*). The kite was not responded to until two days later (April 19) at 11:00am, when nurse Elizabeth Wetherill wrote: "You have been placed on Chronic Care with the medical provider. At this time your Blood Pressure is low as well as your heart rate so your water pill is not indicated. You have an inhaler for shortness of breath." (*Id.*). Wetherill was a charge nurse who was filling in for a kite nurse that day. (Wetherill Dep. 48:18–19, Ex. 24 to Resp. Exs., ECF No. 107-84). She testified that, as a charge nurse working in the north or south tower, she did not typically handle kites and had only been trained on how to respond to a kite by a coworker. (*Id.* 54:7–19; 95:7–23). At the time of her deposition, she did not know whether LPNs taking kite requests were supposed to take the patient's vital signs, and at the time she responded to Wright's kite request, she was not familiar with what a category 1 on the triage scale meant. (*Id.* 103:24–104:2; 49:23–50:2). Thus, she was unaware of the time period within which Category 1 kites must be responded, nor did she know that charge nurses must personally examine patients with category 1 kites. (*Id.* 123:17–21, 103:9–

19). She testified that she based her comments on Wright's vital signs last recorded on April 11, 8 days prior, and the note that his water pill was not indicated was based on the fact that Wright did not have a diuretic listed on his medications. (*Id.* 73:9–18, 89:25–90:13).

On April 19, the same day Wetherill responded to Wright's second kite, an LVMPD corrections officer noted in LVMPD records that Wright told him he had shortness of breath, and that a nurse (Alexia Mahoney) was contacted in response. (LVMPD Incident History, Ex. 25 to Resp. Exs., ECF No. 107-25). The officer noted that he was taken for an "A.K.G." with a heart rate of 140. (*Id.*). Alexia Mahoney testified that she took Wright's heart rate which was "highly elevated" between 130 and 180. (Mahoney Dep. 23:4–7, Ex. 19 to Resp. Exs., ECF No. 107-19). She then reported that to charge nurse Jay Marcos by phone. (*Id.* 38:2–6). An E.K.G was taken showing that Wright had a heart rate of 115 and was suffering from a possible septal infarct. (Medical Records at LVMPD000093, Ex. 13 to Resp. Exs.). Nurse Marcos completed a Progress Note that explained that Wright again reported he was hospitalized in early April and diagnosed with heart failure. (Medical Records at LVMPD000106, Ex. 13 to Resp. Exs.). He further noted that Wright complained of chest pain, shortness of breath, and abdominal pain. (*Id.*). Marcos then listed actions to be taken, including notifying Nurse Practitioner Ray Montenegro, re-checking Wright's vital stats in the PM, and resending the ROI to Mountain View Hospital. (*Id.* at LVMPD000107.). Those actions were orders from Nurse Practitioner Ray Montenegro, who testified that he gave those orders based upon Marcos's oral reporting. (Montenegro Dep. 31:18–32:4, Ex. 26 to Resp. Exs., ECF No. 107-26).

Also on April 19, Wright sent a letter to Essix in which he wrote:

> Im having a hard time breathing when I go to sleep Im holding my breath again when Im sleep I need my pills. baby my body is holding water my stomach is fat I signed another paper to release my pill. baby Im starting to get scaryed cuz I don't want to die in jail so please pray for me. . . . I feel like dieing I can't breath baby it hurts.

(Letter to Essix, Ex. 27 to Resp. Exs., ECF No. 107-27) (spelling errors in original).

On April 20, Essix and Trimble took all of Wright's medications and the Mountain View Hospital paperwork to CCDC. (Essix Dep. 173:10–174:9, Ex. 9 to Resp. Exs., ECF No. 107-9). Essix testified that the employee at the CCDC property window did not look at the medications or paperwork and told her that CCDC cannot accept them. (*Id.* 185:7–10, 187:2–4; 187:25–188:5). Trimble called CCDC the same day, attempting to inform them of Wright's medical condition and his need for medications. (Trimble Phone Records, Ex. 28 to Resp. Exs., ECF No. 107-28); (Trimble Dep. 468:2–20, Ex. 10 to Resp. Exs., ECF No. 107-10). Trimble testified that the CCDC operator wrote down the medication list and told Trimble that she would pass the information onto medical. (*Id.* 469:6–9).

On April 22, Essix visited Wright at CCDC. (CCDC Visitor Log, Ex. 16 to Resp. Exs.). Essix testified that during that visit, Wright's "whole body was swollen," his "speech was dragged," and he was sad and scared. (Essix Dep. 286:1–13, Ex. 9 to Resp. Exs.). Essix called CCDC on April 24 and April 26 to again urge them to give Wright his medications. (Essix Phone Records, Ex. 32 to Resp. Exs., ECF No. 107-32).

On April 23, Trimble spoke with Wright on the phone. (Trimble Dep. 514:8–517:9, Ex. 10 to Resp. Exs, ECF No. 107-10). Trimble testified that Wright said during this call that he could not breathe, could barely talk, had no energy, and had still not gotten his medication. (*Id.* 515:17–516:21).

Wright submitted a third medical kite on April 24 which is difficult to read, but it appears to say he needed pain medication for his stomach. (April 24 Kite, Ex. 31 to Resp. Exs., ECF No. 107-31). The unidentified LPN who saw Wright in response to the kite wrote "requesting medication" and did not make a note of Wright's vitals. (*Id.*). Kite Nurse Jenelle Salas responded to the kite on April 26, writing "Kite request not fully legible. Note pain reliever Tylenol and/or Motrin are available from commissary." (*Id.*).

On April 26, private investigator Marc Maston visited Wright at CCDC to interview him for the public defender. (Maston Interview Notes at 1, Ex. 35 to Resp. Exs., ECF No. 107-35). In the notes Maston took of the interview, Maston wrote:

> Wright sounded like he was winded throughout the interview. Wright was asked what was wrong with him. Wright said he was suffering from heart failure. Wright is a young man at 35 years of age. Wright said about 6 months ago he got a bad batch of drugs and had a heart attack which caused him to suffer significant damage. Wright said the jail is not providing him with medication. Wright said his family has been trying to drop his meds at the jail, but they are refusing to accept it.

(*Id.* at 2). There are no records indicating that Maston contacted anyone with concerns about Wright's condition.

The day following that interview, Wright attended his preliminary hearing via video while at CCDC. (Butler Dep. 20:2–18, Ex. 8 to Resp. Exs.); (LVMPD Incident History, Ex. V to LVMPD MSJ, ECF No. 79-22). A corrections officer observed Wright vomiting blood. (LVMPD Incident Report, Ex. v to LVMPD MSJ). The incident report, entered at 7:30 AM, states that the officer "called a code 99" for Wright because he was throwing up blood, and "[m]edical responded with Sgt Weir and Mailloux. It was decided to have him transported out to [University Medical Center]." (*Id.*). At 11:46 AM, Wellpath nurse Heather Hanash entered a Progress Note, assessing Wright with "Fluid overload/CHF exacerbation"; "(R) lower lobe suspected pneumonia"; and "hematemesis." (Medical Records at LVMPD000104, Ex. 13 to Resp. Exs.). Hanesh also filled out an Emergency Room/Direct Admit Referral Request form for Wright to be transferred to UMC. (Medical Records at LVMPD000076, Ex. 13 to Resp. Exs.).

Wright was admitted to University Medical Center at 9:04 AM. (UNVLD Medical Records at 1, Ex. W to LVMPD MSJ, ECF No. 79-23). He was intubated and sedated on admission, and his condition continued to deteriorate. (UNVLD Medical Records, Ex. W to LVMPD MSJ, ECF No. 79-23). By the afternoon, LVMPD contacted the court and the state of

California so Wright could receive medical treatment and likely pass away in the companionship of his loved ones and without police present. (April 27 Email at 1, Ex. X to LVMPD MSJ, ECF No. 79-24). The request was granted, and Wright was released from LVMPD custody that day. (*Id.*). Wright died at University Medical Center on April 30, 2021.

Wright's sister Daichena Thomas (as representative of the estate and in her personal capacity), his mother Dana Thomas, and his brothers Devontay Thomas, Delon Armstrong, J.W., and Germaine Carmena brought suit in state court. (*See generally* Compl., Ex. A to Pet. Removal, ECF No. 27). The case was filed against Clark County Detention Center, LVMPD, Wellpath, LLC, and a number of individual Wellpath employees. (*Id.* ¶¶ 8–21). The Wellpath Defendants subsequently removed the case to this Court. (Pet. Removal, ECF No. 27). The Wellpath Defendants and LVMPD now move for summary judgment on all claims against them. (*See generally* Wellpath MSJ); (*see also* LVMPD MSJ).

## II.   **LEGAL STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd.*

*P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citation and quotation marks omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). However, the nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible

discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   DISCUSSION

The Court first addresses Wellpath's Motion to Dismiss before turning to the pending Motions for Summary Judgment.

### A.   Wellpath's Motion to Dismiss

On November 15, 2024, Wellpath filed a Suggestion of Bankruptcy and Notice of Stay. (Suggestion of Bankruptcy, ECF No. 135). The Court subsequently stayed this case pending the bankruptcy proceedings. (Minute Order, ECF No. 136). Following several months of bankruptcy proceedings, on May 1, 2025, the Bankruptcy Court entered its findings of fact, conclusions of law, and order "(I) Confirming the First Amended Joint Chapter 11 Plan of Reorganization of Wellpath Holdings, INC. and Certain of its Debtor Affiliates . . ." (the "Confirmation Order") and the *General Form of Order Regarding Lift Stay Motions* ("Stay

Order"). (Conf. Order, Ex. A to Mot. Dismiss, ECF No. 148-1); (Stay Order, Ex. B to Mot. Dismiss, ECF No. 148-2). Under the confirmed Bankruptcy Plan, all claims and causes of action against Wellpath and its affiliated debtors are discharged and holders of those claims are permanently enjoined from commencing or continuing any proceeding of any kind or enforcing recovery from the Debtors. (Conf. Order, Ex. A to Wellpath Mot. Dismiss). Once the bankruptcy stay was lifted, Wellpath filed a Motion to Dismiss arguing that the Plan foreclosed any claim against it. (*See generally* Mot. Dismiss, ECF No. 148). Plaintiffs argue that Wellpath should remain as a defendant in this case for the purpose of pursuing third-party insurance proceeds or recovering from the liquidating trust. (Resp. Mot. Dismiss 3:14–5:12, ECF No. 157).

The Bankruptcy Plan specifies that Wellpath's Liquidating Trust is the proper entity to pursue in a nominal capacity:

> Holders of personal injury tort and wrongful death Claims against the Debtors are subject to the Trust Distribution Procedures ("TDPs"), including the non-binding alternative dispute resolution process set forth therein to determine, if necessary, the allowed amount for their Claim. Such holders of personal injury tort and wrongful death claims may also seek determinations of the Debtors' liability by the appropriate civil court pursuant to 28 U.S.C. § 157(b)(5) with the Liquidating Trust as a nominal party (a) to the extent such inclusion is necessary to recover against available third-party insurance proceeds or an unreleased Non-Debtor Defendant, or (b) to establish or liquidate the amount of their claim for distribution under the Plan from the Liquidating Trust.

(Stay Order ¶ 4, Ex. B to Mot. Dismiss). Consequently, under the Plan, Plaintiffs can proceed against Wellpath pursuant to the alternative dispute resolution procedures described in the Bankruptcy Plan, which would take place in the bankruptcy court. (*Id.*). Alternatively, they may litigate in this Court against Wellpath's Liquidating Trust as a nominal party for the purpose for establishing liability. (*Id.*). But Plaintiffs cannot maintain Wellpath itself as a nominal defendant, as they seek to. Accordingly, Wellpath's Motion to Dismiss is GRANTED

without prejudice to Plaintiffs' right to seek appropriate relief in the bankruptcy court, or to substitute the Liquidating Trust as a nominal defendant here.  The Court grants Plaintiffs leave to amend the complaint to name the Liquidating Trust as a nominal defendant if they so choose.

### B.  Motions for Summary Judgment

The Wellpath Defendants and LVMPD both filed Motions for Summary Judgment.  The Court first addresses issues raised by both, before separately analyzing the Wellpath and LVMPD MSJs in turn.

### 1.  Plaintiffs' Second Cause of Action

All Defendants move for summary judgment on Plaintiffs' second cause of action: a substantive due process claim asserted against Doe Defendants.  Plaintiffs argue that the claim against the Doe Defendants should not be dismissed because they have a right under Federal Rule of Civil Procedure ("FRCP") 15 to amend their complaint up to the time of trial and during the time of trial. (Resp. 98:19–25).  But as Defendants correctly point out, the deadline to amend the pleadings and add parties has passed.  FRCP 16(b) requires the court to issue a scheduling order that includes time limits for joining parties and amending pleadings. Fed. R. Civ. P 16(b).  As the Ninth Circuit has explained, once a district court has set a pretrial scheduling order, FRCP 16's rules standards govern, not FRCP 15. *See Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 765 (9th Cir. 2017); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992) ("Once the district court had filed a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which established a timetable for amending pleadings[,] that rule's standards controlled.").

Because the deadline to amend the pleadings has long passed here, Plaintiffs could only amend the pleadings to name the Doe Defendants now if they could show both good cause and excusable neglect for missing the deadline. Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); Local Rule 26-3 ("A request

made after the expiration of the subject deadline will not be granted unless the movant also demonstrates that the failure to act was the result of excusable neglect.")  Plaintiffs having not made either showing for why the deadline should be extended, the Court agrees that Plaintiffs' second cause of action asserted only against Doe Defendants should be dismissed.

### 2.  Stipulated Dismissals

Following the briefing of the Motions for Summary Judgment, the parties stipulated to the dismissal of the following claims and parties with prejudice: the Equal Protection claim against all Defendants, (ECF No. 126); Plaintiffs Daichena Thomas in her individual capacity, Devontay Thomas, Delon Armstrong, J.W., and Germain Carmena, (ECF No. 127); and Defendants Kate Purcell, RN, Becky Chistensen, RN; LPN Alexia; and H. Hannash, RN, (ECF No. 124).  Thus, the Court will not address any of the arguments raised regarding the now dismissed claims or parties in this Order.

### 3.  LVMPD's Motion for Summary Judgment

LVMPD moves for summary judgment on all of Plaintiffs' claims asserted against it. The Court begins by determining whether summary judgment is warranted on Plaintiffs' Fourteenth Amendment due process claim, brought under 42 U.S.C. § 1983.

### a.  Section 1983

Section 1983 actions involve the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  To bring a successful § 1983 claim, a plaintiff must allege (1) a violation of a constitutional right and (2) must show that the alleged violation was committed by "a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Moreover, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

LVMPD argues that (1) only the Estate may bring a claim under § 1983, so the claims of individual plaintiffs fail as a matter of law, and (2) Plaintiffs have failed to establish a policy, custom, procedure or policy that would lead to municipal liability under § 1983. The Court considers each argument in turn.

### i. Claims held by the Individual Plaintiffs

LVMPD first argues that only the Estate of Palmer Wright, and not any of the individual plaintiffs, may recover on a § 1983 action. (LVMPD MSJ 16:14–22, ECF No. 79). The parties have stipulated to dismiss all claims brought by the Wright siblings, (*see* Order Granting Stip., ECF No. 131), so the Court does not address the parties' arguments on those claims. (Resp. 109:13–18). However, Plaintiffs argue that Wright's mother, Dana Thomas, has a cognizable Fourteenth Amendment claim under § 1983. (*Id.* 107:6–108:7).

The Ninth Circuit has recognized that "parents have a Fourteenth Amendment liberty interest in the companionship and society of their children." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Parents can assert a substantive due process claim for deprivation of that liberty interest. *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 371 (9th Cir. 1998) *as amended* (Nov. 24, 1998). As an initial matter, LVMPD asserts that Dana Thomas has not plead a claim for deprivation of her liberty interest. (LVMPD MSJ at 12 n. 2). While LVMPD is correct that the Complaint does not contain a separately pled cause of action for deprivation of Dana Thomas's liberty interest arising out of her parent/child familial relationship, it does include a statement under Claim One (§ 1983 Due Process) that "plaintiffs have suffered grief and sorrow and loss of companionship and support of the decedent." (Compl. ¶ 54, Ex. A to Pet. Removal, ECF No. 27). Moreover, Plaintiffs put LVMPD on notice of their intent to seek damages related to loss of companionship in their initial discovery disclosure. (Plaintiffs' Initial Disclosure 4:14–16, Ex. 51 to Resp. ECF No. 123-1). Because LVMPD had notice of the intent to seek damages for loss of companionship, it was not severely

prejudiced by Dana Thomas's failure to assert her substantive due process claim for loss of companionship as a separate cause of action.  The Court will therefore construe the statement that Plaintiffs suffered a loss of companionship as an assertion of a § 1983 due process claim for the deprivation of Dana Thomas's liberty interest.

LVMPD next argues that § 1983 claims may only be held by the estate, citing *Moreland.* (LVMPD MSJ 16:14–22).  However, Defendant mistakenly takes the panel's ruling regarding *Fourth* Amendment claims—which are personal and may only be pursued by an estate—and expands it to apply to all § 1983 claims. *Moreland*, 159 F.3d at 369.  Surviving parents do have a cognizable claim under the Fourteenth Amendment that they may assert as a substantive due process claim under § 1983. *Id.* at 371.  Accordingly, the Court finds that Dana Thomas's Fourteenth Amendment claim for loss of companionship can proceed.

### ii.  *Monell* Claim against LVMPD

LVMPD next argues that Plaintiffs fail to prove that LVMPD is liable as a municipality under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (LVMPD MSJ 20:4–19).  Under *Monell*, municipalities can be sued directly under § 1983 for violations of constitutional rights. *See Monell*, 436 U.S. at 690.  A litigant may recover from a municipality under § 1983 on one of three theories of municipal liability. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), *overruled in part by Castro v. Cty. of Los Angeles*, 591 .3d 1232 (9th Cir. 2010).  "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Id.* (quoting *Monell*, 436 U.S. at 708 (Powell, J. concurring)).  "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of omission, when such omissions amount to the local government's own official policy." *Id.*  "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional

decision or action and the basis for it.'" *Id.* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).  These three theories are sometimes referred to as (1) commission, (2) omission, and (3) ratification, respectively. *See Clouthier*, 591 F.3d at 1249–60.

Plaintiffs rely on the commission theory of *Monell* liability, arguing that LVMPD's policies, customs, procedures, or practice led to Wright's constitutional deprivation. (Resp. 86:6–8).  LVMPD offers two arguments for why summary judgment should be granted in its favor on Plaintiffs' *Monell* claims.  First, it argues that it cannot be held liable for Wellpath's policies and practices. (LVMPD MSJ 23:5–19).  Second, it argues that Plaintiffs have failed to provide evidence of a custom or practice that would give rise to municipal liability under *Monell.* (*Id.* 20:4–19).  The Court considers each argument in turn.

### (A).    LVMPD's Liability for Wellpath's Policy, Customs, Procedures, or Practices

LVMPD first argues that it is entitled to summary judgment on Plaintiffs' § 1983 claims because Plaintiffs have failed to produce any evidence of a custom or practice belonging to LVMPD that would subject it to *Monell* liability, and it cannot be held liable for Wellpath's customs. (LVMPD MSJ 15:22–18:28).  Plaintiffs respond that LVMPD had a nondelegable duty to provide adequate healthcare at CCDC and therefore remains liable for any constitutional deprivations caused by Wellpath's policies or customs. (Resp. 83:20–85:5).  While LVMPD appeared to originally concede that it could be held liable for Wellpath's policies and customs (as opposed to the actions of the individual Wellpath employees), (*see* Reply at 6 n. 1), it appears to change its position in its Notice of Supplemental Authority, (ECF No. 167).

In its Notice, LVMPD points the Court to an unpublished Ninth Circuit decision from January of 2026: *Peterson v. Nevada Cnty.*, No. 23-16146, 2026 WL 67583 (9th Cir. Jan. 8,

2026). (Not. Suppl. Auth. 2:3, ECF No. 167).  In *Peterson*, the court considered the plaintiff's allegation that the county was "liable for Wellpath's constitutional violations because the County was the primary 'moving force' behind such constitutional violations." *Id.* at *3.  The panel rejected the "novel theory of liability,"[4] providing only the following explanation: "County policy explicitly states that the County is not responsible for the medical decisions of Wellpath employees, and, even if the County were responsible, given that Plaintiff was attended to by medical personnel nine times in two days, no triable issue of fact was presented that the medical personnel were deliberately indifferent to Plaintiff's medical needs." *Id.*

The parties do not cite, and the Court is not aware of, any binding Ninth Circuit precedent on the issue of whether a government entity can be held liable for constitutional violations caused by the policies of the company it contracts with to provide medical care in a detention facility.  But the Court is not persuaded that *Peterson* decides the question.  *Peterson* not only provides little reasoning for the Court to deduce how it reached its conclusion, but also appears to base its conclusion on a county policy explicitly stating it was not responsible for medical decisions made by Wellpath employees, a policy that LVMPD does not assert exists here. *Id.*  Further, Plaintiffs here are not asserting that LVMPD "is liable for Wellpath's constitutional violations because [it] was the primary 'moving force' behind such constitutional violations," *id.* at *3; rather, Plaintiffs assert that LVMPD's duty to provide constitutionally adequate medical care is nondelegable such that it can be held liable for constitutional violations caused by Wellpath's policies and customs.  Precedent from other circuits, as well as decisions from other district courts in the Ninth Circuit, persuade the Court that the theory in this case is neither novel nor incorrect.

---

[4] In dissent, Judge Paez disagreed with this characterization, stating that the plaintiff's "moving force" claim was "not novel." *Id.* at *5.

For example, in *King v. Kramer*, the Seventh Circuit held a county could be liable for the deliberate indifference of jail medical providers employed by an independent contractor to which the county had delegated "final decision-making authority . . . over inmates' access to physicians and medications." 680 F.3d 1013, 1020 (7th Cir. 2012).  The court explained that a county "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *Id.*  It distinguished the underlying rationale for this theory of liability from *respondeat superior*, instead explaining that it is based "on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.* (citing *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705–06 (11th Cir. 1985) (explaining that the county "remains liable for any constitutional deprivations caused by the policies or customs of a contracted medical provider.")).

The Court finds this reasoning persuasive, especially when considered alongside the Supreme Court's statement in *West v. Atkins* that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." 487 U.S. 42, 56 (1988).  District courts in the Ninth Circuit, including this District, have concluded that a local government's constitutional duty to provide adequate medical care is non-delegable and the government remains liable for the policies and practices for its contractor. *See, e.g.*, *O'Neal v Las Vegas Metro. Police Dep't*, No. 2:17-cv-02765-APG-GWF, 2018 WL 4088002 at *4 (D. Nev. Aug. 27, 2018) ("Clark County remains liable for any constitutional deprivations caused by the policies, practices, or customs of its contractor."); *Roberts v. City of Bainbridge Island*, No. C21-5165 TSZ, 2021 WL 3739125, at *3 (W.D. Wash. Aug. 24, 2021); *Lemmons v. Cnty. of Sonoma*, No. 16-CV-04553-WHO, 2018 WL 452108, at *3 (N.D. Cal. Jan. 17, 2018) ("While CFMG provides the medical care for Sonoma County's prisoners, Sonoma County remains liable for any constitutional deprivations caused by the policies, practices, or customs of CFMG.")

Given the existing persuasive precedent, and absent binding authority to the contrary, the Court concludes that LVMPD's nondelegable constitutional duty to provide adequate medical care at CCDC renders it liable for constitutional deprivations caused by its contractor's policies and practices.  Consequently, though Plaintiffs do not identify policies specific to LVMPD, the Court does not grant summary judgment in favor of LVMPD on that basis.

### (B).    Wellpath's Customs

LVMPD next argues that even if it is liable for Wellpath's customs, Plaintiffs have failed to sufficiently prove that a custom existed for the purposes of *Monell* liability.  Plaintiffs do not point to an official policy that is unconstitutional, but they instead argue that Wellpath's customs, procedures, and practice led to a constitutional deprivation.  Here, because the Court has now dismissed Wellpath as a Defendant, and because LVMPD did not file a joinder to Wellpath's MSJ or Reply, the Court considers only those arguments made by LVMPD regarding summary judgment on the *Monell* claim arising out of Wellpath's customs.

To prevail on their *Monell* claims, Plaintiffs must prove: "(1) [plaintiffs] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).

If a plaintiff cannot demonstrate a facially unconstitutional policy, he may prove the existence of a custom, procedure or practice that gave rise to the constitutional violation. *Gordon,* 6 F.4th at 974.  The custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" city policy. *Trevino v. Gates*, 99 F.3d 911, 919 (9th Cir. 1996) (quoting *Monell*, 346 U.S. at 691).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out

policy." *Trevino*, 99 F.3d at 918.  A single instance of a constitutional violation is generally not sufficient to establish custom or policy. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

LVMPD's challenge focuses on the second and third elements of the claim: whether a custom existed, and whether that custom amounted to deliberate indifference to Plaintiffs' constitutional right. *See Gordon*, 6 F.4th at 973.  LVMPD asserts that Plaintiffs have failed to provide any evidence that the alleged deficient customs affected any other inmate at CCDC. Because a single incident is generally insufficient to support a finding of the existence of a custom, and LVMPD points out a lack of evidence regarding other incidents impacting inmates other than Wright, the Court finds that LVMPD has met its initial burden of negating an essential element of Plaintiffs' claim. *See City of Oklahoma City*, 471 U.S. at 823–24.

The burden then shifts to Plaintiffs to raise a genuine dispute of material fact on the existence of a *Monell* custom.  Plaintiffs allege the existence of five customs or procedures that led to constitutional violations: (1) verification of patient medication practices, (2) the custom of not developing a treatment plan until a response to ROI is received, (3) the kite procedure, (4) the lack of procedure for family members to relay inmate's medical information to Wellpath, and (5) the practice of maintaining inadequate medical staffing. (Resp. 76:28, 78:14–16; 79:17–19; 85:25–28; 90:12–91:23).  The Court examines each alleged custom in turn.

*(1.)    Verification of Medication*

Plaintiffs first contend that Wellpath had a custom of using ROI medical requests to verify patient medications that was deliberately indifferent to Wright's right to adequate healthcare. (Resp. 77:1–3).  LVMPD argues that Plaintiffs fail to provide evidence that Wellpath has a custom of faxing an ROI and waiting to develop a treatment plan until a response is received. (LVMPD Reply 7:4–12).  Instead, it contends that the existence of such a custom is undermined by Plaintiffs' reliance on the existing Wellpath policy that requires a

different course of action. (*Id.* 8:8–18).  It further asserts that Plaintiffs have not provided evidence to support a finding that such a custom would be constitutionally deficient. (*Id.* 7:13– 8:7).  The Court disagrees and finds that Plaintiffs have met their burden of raising a genuine issue of fact on this custom.

Plaintiffs identify an official Wellpath policy that they allege requires calling the prescriber at booking so that medication therapies could be continued within a 24–48-hour period. (Resp. 77:22–26); (Wellpath Policies at E09A-00001–E09B-000003, Ex. 45 to Resp. Exs., ECF No. 107-45).  While the Wellpath Defendants take issue with Plaintiffs' interpretation of that policy, (Wellpath Reply 4:14–5:7), the Court finds that Plaintiffs' interpretation is plausible based on the text of the policy and therefore raises a genuine issue of fact as to what Wellpath's official policy required.[5]

LVMPD argues that the existence of this written policy undermines Plaintiffs' argument that a different custom actually existed.  "But a plaintiff can show a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 n. 10 (9th Cir. 2016).  LVMPD asserts that Plaintiffs have only introduced evidence to show Wellpath did not follow its official policy in this one instance involving Wright.  The Court does not agree.

Plaintiffs provide sufficient evidence to support a finding that Wellpath's actual practice deviated from the official policy.  Specifically, Plaintiffs provide the deposition of Wellpath Medical Director Larry Williamson, where Williamson stated that "[i]t's routine to have a patient sign for a Release of Information in the booking area," so if a provider wants records, they have the ROI available to them. (Williamson Dep. 95:21–96:5, Ex. 15 to Resp. Exs.).  He

---

[5] This finding is further explained in the below discussion of the claims against individual Wellpath employee defendants.

further testified that he has encountered situations where he felt he should not wait for a response to an ROI, so he has instead called hospitals to request records. (*Id.* 97:1–17). But Williamson explicitly stated that making such calls is "the exception," and that it is "very unusual [he] would do that." (*Id.* 97:24–98:3).

Additionally, though LVMPD argues that Plaintiffs provide evidence of only one instance of this conduct, Plaintiffs in fact identify at least two separate instances involving Wright where Wellpath providers chose not to call Mountain View Hospital and instead sent ROIs. The fact that these two instances happened to the same person within a relatively short time period does not negate that Plaintiffs have identified multiple examples of the alleged practice. *See Menotti v. City of* Seattle, 409 F.3d 1113, 1147–49 (9th Cir. 2005) (holding that a series of constitutional violations committed by multiple officers during the course of a single day was sufficient to raise a dispute of fact as to whether the city had an unconstitutional custom). When viewed in the light most favorable to the Plaintiffs, such evidence, in conjunction with Williamson's testimony that it was a regular practice to have patients sign ROIs, raises an issue of fact as to whether the alleged custom of using ROI medical requests to verify patient medications.

As to LVMPD's argument that Plaintiffs have failed to introduce evidence to support a finding that the policy of sending ROIs and waiting for a response is constitutionally deficient, the Court first notes that LVMPD provides no law to support this argument. Nevertheless, the Court concludes that there is evidence sufficient for a jury to find that the policy of sending ROIs and waiting for a response, as opposed to calling medical providers, is constitutionally deficient as to people taking medications where an interruption in medication could result in negative health impacts. Wellpath has an official policy requiring that "every effort" be made to administer "High-Priority medication" by the next scheduled dose, but no later than 24 hours after notification of the medication by the patient. (Wellpath Policies at E09A-00001–E09B-

000003, Ex. 45 to Resp. Exs.). Further, Medical Director Williamson testified that he has encountered situations where he felt he should not wait for a response to an ROI, so he has instead called hospitals to request records. Evidence that such an official policy exists, and that Wellpath has taken the described course of action in some situations, could allow the jury to find that the failure to take more proactive efforts to verify medications is a constitutionally deficient practice that results in the deprivation of the right to adequate medical care.

Accordingly, the Court concludes that Plaintiffs have met their burden of raising a genuine issue of fact as to the existence of a custom that resulted in the deprivation of Wright's constitutional rights.

### (2.) Custom of Not Developing a Treatment Plan Until a Response to an ROI is Received

Plaintiffs next argue that Wellpath had a constitutionally deficient policy of providers waiting to develop a treatment plan for a patient until they received a response to an ROI. (Resp. 78:14–79:16). In support, they point to the fact that no treatment plan was developed for Wright during the 21 days he was under Wellpath's care. (*Id.* 78:17–18). They again point to Wellpath's written policy requiring that treatment plans for chronic care patients must be developed as soon as the chronic condition is identified. (*Id.* 79:8–16); (Wellpath Policies at F01-000001–05, Ex. 45 to Resp. Exs.). But, unlike the first custom, Plaintiffs fail to provide sufficient evidence to raise an issue of fact as to whether Wellpath's actual custom differs from the written policy. Here, Plaintiffs only point to Wright's experience as evidence that Wellpath's practice is to not develop treatment plans for chronic care patients like Wright. They also identify testimony from Williamson and Montenegro describing how a treatment plan would be developed for someone like Wright, but such evidence does not support a finding that Wellpath regularly acts in violation of its written policy on treatment plans. Accordingly, the Court grants summary judgment in favor of LVMPD on this claim.

*(3.)    Kite Procedure*

Plaintiffs next allege that Wellpath had a constitutionally deficient custom of responding to health care requests ("kites").  Specifically, Plaintiffs identify a custom of Wellpath not consistently doing an in-person physical assessment of patients in response to kites, including when the kites were triaged as category one. (Resp. 79:19–85:24).  Like the first alleged custom, this argument is premised on the idea that Wellpath's actual practice impermissibly deviated from the written policy requiring that all patients be seen by a nurse in response to a kite. (*Id.* 81:23–28).  LVMPD contends that Plaintiffs claim on this custom must fail because they do not provide any evidence to show that the official written policy was not followed in any other instance. (LVMPD Reply 9:22–24).

Plaintiffs identify the Wellpath written policy that provides that a "face-to-face encounter" for a health care request, or kite, "is conducted by a qualified health care professional, or the health care liaison (if applicable), within 24 hours of receipt by health care staff." (Wellpath Policies at WELLPATH E07-000003, Ex. 45 to Resp. Exs.).  It further states that "[a]ll requests that are triaged as emergent shall be seen immediately," and "[u]rgent requests shall be scheduled for the next provider's sick call." (*Id.*).

Contrary to that written policy, Plaintiffs contend that Wellpath's custom was in fact to not see a patient in person in response to a kite.  They identify three separate occasions where they claim there is no evidence that Wright was seen in person in response to his kites.  First, Wright submitted a kite on April 15 stating "I need my medication for my heart I need to talk back to the doctor ASAP hard to breath when I go to sleep." (April 15 Kite, Ex. 18 to Resp. Exs.).  This kite was triaged as a Category 2 at 7:35 AM on April 15 by an unidentified Registered Nurse. (*Id.*).  Then, a different unidentified Licensed Practice Nurse ("LPN") appears to have done a "face-to-face" with Wright in response to the kite. (*Id.*).  The LPN noted that Wright "[w]ould like to speak to Dr. about heart medication and hard to breath [sic]." (*Id.*).

The LPN did not make any notes that indicate they took Wright's pulse or blood pressure but wrote "Lungs clear bilat. 97% O2 Sat. NAD." (*Id.*). Lastly, kite nurse Lau wrote: "Seen 4/11/21" and signed the form at 2:41 PM on April 15.

Lau confirmed that he did not see Wright in connection with his April 15 kite. (Lau Dep. 65:13–23, Ex. 20 to Resp. Exs.). But based on the notes on the kite, it appears Wright was seen "face-to-face" by an unidentified LPN in response to his April 15 kite. (April 15 Kite, Ex. 18 to Resp. Exs.). Plaintiffs state that the policy requires that the kite or charge nurse see the patient in person, without identifying specific language in written policies requiring that. The Wellpath policy Plaintiffs identify requires a face-to-face consultation by a "qualified health care profession," a category that the policy indicates includes nurses. (Wellpath Policies at WELLPATH E07-000002, Ex. 45 to Resp. Exs). Being seen by an LPN, as Wright was in response to his April 15 kite, would appear to satisfy the policy's requirement.

Wright next filed a kite on April 17, which states "I need to talk to a Doctor it's been 2 weeks in I have not had my water pills are my heart pill I can't breath when I go to sleep I need help I need help nobody's helping me." (April 17 Kite, Ex. 23 to Resp. Exs.). This kite was triaged as Category 1 on April 17 at 8:00pm by an unidentified person who noted: "Sick call for heart medication and complications. [Complains of] retaining water and [shortness of breath]." (*Id.*). The kite was ultimately not responded to until April 19 at 11:00am. Nurse Wetherill responded: "You have been placed on Chronic Care with the medical provider. At this time your Blood Pressure is low as well as your heart rate so your water pill is not indicated. You have an inhaler for shortness of breath." (*Id.*). There is no indication on the kite that Wright was seen face-to-face. Unlike the April 15 kite, there are no notes that would indicate that a nurse took his vital signs.

Wright filed his final kite on April 24. (April 24 Kite, Ex. 31 to Resp. Exs.). This kite was not fully legible but appears to read "I need so [sic] pain matcaition [sic] for my stomack

[sic] [illegible word] to check if you got my stomack [sic] for my." (*Id.*).  The kite was triaged as Category 3 on April 25 at an unspecified time, and the kite was not responded to until April 26 at 1:22 PM. (*Id.*).  The response stated: "Kite request not fully legible," and "[n]ote pain reliever Tylenol and/or motrin are available from commissary." (*Id.*).  Similar to the April 17 kite, there is no indication that Wright was ever seen in response to this kite.

Viewing the facts in the light most favorably to Plaintiffs, there are two separate instances where Wellpath employees did not see Wright in response to his submitted kites. Additionally, Plaintiffs provide testimony from the only two kite nurses working at CCDC at the time of the subject incident. (Lau Dep. 19:22–20:2, Ex. 20 to Resp. Exs.).  Both kite nurses were unaware of Wellpath's written policy on responding to kites and testified that face-to-face consultations were not required in response to kites. (*Id.* 24:7–10); (Salas Dep. 24:1–25:11, Ex. 21 to Resp. Exs).  This testimony, and the testimony from nurse Wetherill along the same lines, (Wetherill Dep. 102:24–103:8, Ex. 24 to Resp. Exs.), raises an issue of fact as to whether Wellpath had a custom of not seeing patients in response to kites that was so long standing so as to be seen as policy.  Having reached that conclusion, the Court rejects LVMPD's argument that Plaintiffs failed to provide sufficient evidence to support a finding that this alleged custom exists and denies LVMPD's Motion for Summary Judgment on that basis.

(4.)     *Medical Information from Family and Friends*

Plaintiffs next assert that the absence of a Wellpath policy whereby family members and friends can communicate medical information that can be incorporated into patient medical care was deliberately indifferent. (Resp. 85:25–28).  They point to the fact that Essix and Trimble both called and visited CCDC at least five times in an attempt to inform the facility of Wright's medical needs and deliver his medications, but that information was not incorporated into his medical care and the medications were not accepted. (*Id.* 86:1–87:2).  The absence of a

policy regarding acceptance of this information, Plaintiffs argue, led to the deprivation of Wright's constitutional right to adequate medical care. (*Id.* 87:3–23).

LVMPD contends that Plaintiffs provide no support for their assertion that a policy of not incorporating medical information from family and friends without verification of that information from a medical provider is either unconstitutional or the cause of Plaintiffs' constitutional deprivation. (LVMPD Reply 10:15–18).  The Court agrees.  Plaintiffs provide no evidence that a policy of accepting medical information from friends and family, without verification from a medical practitioner who made a diagnosis and prescribed medicine, would be an acceptable medical practice.  For example, there is no medical expert testimony that accepting medical information from family and friends without verification would be an acceptable medical practice.  Nor is there evidence that Wellpath's failure to incorporate the information from Essix and Trimble was the cause of the constitutional deprivation here.  The final element of a *Monell* claim requires a plaintiff to show that a policy was the "moving force" behind the constitutional deprivation.  Such a showing requires a plaintiff to demonstrate both causation-in-fact and proximate causation. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013).  Even if Wellpath had incorporated the information Essix and Trimble provided, the Wellpath medical providers would not have administered any medications until they were verified by Mountain View Hospital, or a treatment plan was made by a Wellpath provider.  Consequently, Plaintiffs have failed to raise a genuine issue of fact that this alleged custom could be the "moving force" behind their constitutional deprivations.

### *(5.)    Inadequate Medical Staffing*

Plaintiffs lastly assert that Wellpath had a practice of understaffing CCDC. (Resp. 102:13–15).  Chronic understaffing may result in *Monell* liability. *See Est. of Prasad ex rel Prasad v Cnty. of Sutter,* 958 F.Supp 2d 1101, 1116 (E.D. Cal. 2013); *Rettew v. Cassia Cnty.*

No. 1:20-cv-00386-BLW 2022 WL 623206 at *13 (D. Idaho Mar. 2, 2022) ("For purposes of County liability under *Monell*, chronic understaffing may constitute a 'policy.'").

Plaintiffs have provided evidence that the understaffing extended beyond Wright's stay at CCDC. (Mahoney Dep. 82:2–14, Ex. 19 to Resp. Exs.); (Wetherill Dep. 108:19–109:9, Ex. 24 to Resp. Exs.).  Alexia Mahoney, an LPN who conducted medical runs and received kites from inmates, testified extensively about understaffing at CCDC. (Mahoney Dep. 82:2–14, 85:20–87:3, 97:13–98:2, 99:19–101:22, Ex. 19 to Resp. Exs.).  She reported that LPNs were overwhelmed with the volume of work, and as a result did not adequately fill out kites they received. (*Id.* 67:11–69:11, 90:19–100:3).  She also reported issues multiple times to administration, both about LPNs failing to properly fill out kites and about the chronic understaffing, demonstrating that Wellpath could have been aware of the understaffing and the heavy workload on staff as a result. (*Id.* 100:8–22, 108:7–109:4).

Likewise, Elizabeth Wetherill, a per diem charge nurse, testified that she heard complaints about staffing and the subsequent inability to get work done. (Wetherill Dep. 108:5–109:9, Ex. 24 to Resp. Exs.).  She also said that LPNs, often chronically understaffed, were where most of the patient-staff interactions occurred. (*Id.* 109:14–110:17).  LPNs were overstretched by patient care, meaning that it became difficult to do their jobs. (*Id.*).  She said the understaffing began in late 2020 or early 2021. (*Id.* 112:15–113:4).

Nurse Practitioner Ray Montenegro usually worked as the medical provider for booking, however he said he is usually called 10–50 times a day to go provide medical care to patients "upstairs" (i.e. already booked into the jail). (Montenegro Depo. 99:8–100:20, Ex. 26 to Resp. Exs., ECF No. 107-26).  Because he was so busy, he was not always able to look at the chart of patients before being called upstairs. (*Id.* 101:13-102:10).

Plaintiff has also provided expert testimony of Doctor Mayer Rashtian. (Rashtian Initial Expert Report, Ex. 2 to Resp. Exs., ECF No. 107-2).  Dr. Rashtian stated that CCDC's failure

to provide adequate medical care was a result of a failure to provide adequate medical staff, including physicians, physician assistants, and registered nursed. (*Id.* at 11).

Defendant argues that Plaintiffs have failed to provide evidence of an established practice of understaffing, beyond the understaffing present during Wright's detention. (Rep. 15:20–16:4). But as explained above, Plaintiffs have offered evidence that the understaffing was persistent, chronic, and went beyond the time Wright was incarcerated. Moreover, Wellpath was on notice that its understaffing was potentially causing deficient medical care, as evidence by Nurse Mahoney's testimony that she complained multiple times about the staffing and that administrators were aware that CCDC was understaffed.

The Court therefore finds that Plaintiffs have demonstrated a genuine issue of material fact as to whether or not there was a custom or practice of understaffing medical personnel at CCDC that resulted in deficient medical care. Because a reasonable jury could find that persistent understaffing resulted in Wright's constitutional deprivation, LVMPD's Motion for Summary Judgment on Plaintiffs' claim on this policy is denied.

### ii. Failure to Train

Plaintiffs also claim that LVMPD is subject to § 1983 liability based upon a theory of failure to train. (Resp. 98:24–26). However, in their Complaint, Plaintiffs did not plead a *Monell* claim based on the failure to train, nor do any of the allegations in the Complaint mention failure to train. (*See generally* Compl.). The risk of prejudice is acute when the plaintiff adds new claims after the defendant has filed a summary judgement motion. *See, e.g. Johnson v. Hewlett-Packard Co.,* 546 Fed. Appx. 613, 614 (9th Cir. 2013). The Court therefore finds that allowing Plaintiffs' claim of failure to train to proceed would severely prejudice LVMPD and denies leave to amend the Complaint.

### b. Negligence

LVMPD also moves for summary judgment on Plaintiffs' negligence and medical negligence claims.[6]  It argues that it cannot be held liable because it has discretionary act immunity. (LVMPD MSJ 25:4–21).  The Court agrees.

Nevada Revised Statute (NRS) 41.032 provides:

> "[N]o action may be brought . . . against an immune contractor or an officer or employee of the state or any of its agencies or political subdivisions which is . . . [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused.

Nevada has adopted the *Berkovitz-Gaubert* test for discretionary act immunity. *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007).  Under this test, a governmental act or decision is entitled to discretionary-act immunity if it (1) "involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Id.*  This type of immunity may protect even "frequent or routine decisions" at all levels of government, provided they "require analysis of government policy concerns." *Id.*  There are two limitations on discretionary-act immunity: it does not attach for actions taken in bad faith, nor acts taken in violation of the Constitution. *Falline v. GNLV Corp.*, 823 P.2d 888, 891 (Nev. 1991); *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2012).

Because Wellpath was LVMPD's contractor, and all negligence claims are premised on the acts of Wellpath, any negligence claim asserted against LVMPD is necessarily premised on LVMPD's hiring and supervision of Wellpath.  "Nevada's discretionary-function immunity statute . . . bars claims for negligent hiring, training, and supervision." *Plank v. Las Vegas Metro. Police Dep't.*, No. 2-12-CV-2205-JCM-PAL, 2016 WL 1048892, at *8 (D. Nev. Mar.

---

[6] The Court notes that Plaintiffs' negligence claim is only asserted against CCDC.  But, to the extent the "medical negligence" claim is asserted against all Defendants, the Court nevertheless analyzes LVMPD's liability on the negligence claims.

14, 2016).  Accordingly, the Court finds that LVMPD is entitled to discretionary act immunity on the negligence claims against it, so LVMPD's Motion for Summary Judgment on the negligence claim is granted.

### 4.  Wellpath's Motion for Summary Judgment

The Wellpath Defendants move for summary judgment on all claims brought against them. (*See generally* Wellpath MSJ, ECF No. 80).[7]  The Court considers each argument raised in turn.

### a.  Plaintiffs' Experts

The Wellpath Defendants first move to exclude all of Plaintiffs' experts because they do not have experience in correctional medical care, citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  First, such an argument "should have been made in a separately filed *Daubert* motion." *Est. of Taschek v. Fid. Life Ass'n*, 740 F. Supp. 3d 1072, 1086 (D. Nev. 2024) (citing LR IC 2-2(b) ("For each type of relief requested or purpose of the document, a separate document must be filed and a separate event must be selected for that document.")).  And second, beyond stating that the experts do not have experience in correctional medical care, the Wellpath Defendants fail to make any substantive argument under the *Daubert* test for why that inexperience renders the experts' opinions entirely irrelevant and unreliable. (Wellpath MSJ 10:2–11:9).  Accordingly, the Court DENIES the request to exclude all of Plaintiffs' experts without prejudice to the Wellpath Defendants' ability to file pre-trial *Daubert* motions.

### b.  Individual Wellpath Employee Defendants

---

[7] Because the Court has already dismissed all claims against Wellpath, the Court only considers those arguments raised by the individual Wellpath employee Defendants here.  And to the extent the parties have stipulated to dismiss claims and parties as summarized above, the Court does not address arguments regarding those claims here.

The Wellpath Defendants argue that no reasonable jury could find the remaining individual Wellpath employees were deliberately indifferent to Plaintiff's medical needs, and thus move for summary judgment on the § 1983 claims against them.[8]

The elements of a pretrial detainee's medical care claim against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1124–25.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  Plaintiffs must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

The Wellpath Defendants do not dispute that Wright was at a substantial risk of suffering serious harm. (Wellpath Reply 2:14–18).  Instead, they contend that the Plaintiffs fail to offer evidence to support a finding that the individual Wellpath Defendants did not take reasonable measures to abate that risk under the circumstances. (*Id.* 2:18–19).  Specifically, as it pertains to the actions of all the individual Defendants, the Wellpath Defendants contend that

---

[8] Plaintiffs' fourth cause of action, negligence, is not asserted against any of the Wellpath Defendants, so it need not be dismissed. (Compl. ¶¶ 47–56).  As to the medical negligence claim asserted against all Defendants in Plaintiffs' fifth cause of action, the Wellpath Defendants put forth a substantive argument as to why each of them are entitled to summary judgment on that claim.  The Court finds that they have met their initial burden on those medical negligence claims.  Because Plaintiffs failed to substantively respond, they did not meet their burden of raising a genuine dispute of material fact on their medical negligence claims.  The Court therefore GRANTS summary judgment in favor of the individual Wellpath Defendants on Plaintiffs' medical negligence claims.

Plaintiffs fail to provide evidence to support their assertions that calling Mountain View Hospital to verify Wright's medications would have been a reasonable course of action. (*Id.* 3:7–5:20).

Plaintiffs contend that all individual Defendants were deliberately indifferent because they did not call Mountain View Hospital to verify Wright's diagnosis and medications. In support of this argument, they point to Wellpath's own policy regarding medication verification. (Resp. 55:18–56:16). The Medication Verification Policy provides that it is "intended to ensure that there is a process in which to verify reported medications and community prescribers' active prescriptions . . . ." (Wellpath Policies at WELLPATH E09A-000001, Ex. 45 to Resp. Exs.). The Policy requires "[c]onfirmation of the information should be attempted by calling the pharmacy to confirm the legitimacy of the prescription and/or . . . [c]ommunication with the prescriber of his/her office." (*Id.* at WELLPATH E09A-000002). It further states that "[r]eported medications, both those verified and unable to be verified . . . will be discussed with the provider within one (1) day for decision to continue the verified order, substitute another medication, start medication that was unable to be verified . . . or not start a verified (or unverified) order." (*Id.*) Per the policy, the provider "can continue the medication verification process for up to two (2) additional business days." (*Id.*). Lastly, as relevant here, the Policy states: "[m]edications should generally be initiated within 48 hours of notification of the medication to health care staff. During this period the medication should be verified and a supply obtained." (*Id.* at WELLPATH E09A-000003).

Plaintiffs also point to Wellpath's Timely Initiation of Medication Upon Arrival Policy. (Wellpath Policies at WELLPATH E09B-000001, Ex. 45 to Resp. Exs.). This Timely Initiation of Medication Policy is "intended to ensure that patients receive appropriate medications and that medications are administered in a timely manner upon admission to the facility." (*Id.*). The Policy states that both "Routine and High Priority Medications ordered by

an authorized prescriber are to be administered as soon as possible . . . and no later than 48 hours after notification of the medication to health care staff." (*Id.*). It defines "High Priority Medications" as "[t]hose medications which should not be interrupted because of their clinical necessity and which have short enough half-lives that routine initiation within 24 hours of intake may not be quick enough for appropriate continuity of care." (*Id.*). As to High Priority Medications, the policy provides that "[e]very effort should be made to administer [them] by the next scheduled dose after notification of the medication by the patient, but no later 24 hours after notification of the medication to the health care staff." (*Id.*). "The High-Priority medication verification should be attempted with a telephonic communication," and "[i]f the medication cannot be verified during the first attempt by telephone, the provider should be contracted for review." (*Id.*).

The Wellpath Defendants challenge Plaintiffs' characterization of these Policies, contending that they were "misrepresented or taken out of context." (Wellpath Reply 4:16–17). They contend that the Medication Verification Policy only required phone calls to be made *after* the prescription is received from the pharmacy, not before. (*Id.* 4:21–25). They further argue that Plaintiffs claim that Wright's medications were "High-Priority Medications" should be rejected because they offered no evidence to show what constitutes such a medication. (*Id.* 4:25–28). The Court disagrees on both fronts.

Upon review of the policies, the Court finds that a jury could reasonably conclude that the Wellpath Policies required employees to call either a pharmacy or prescriber to verify a medication reported by an inmate. Further, while Plaintiffs do not provide evidence of what constitutes a "High Priority Medication," the Timely Initiation of Medication provides a definition that could allow a jury to conclude that Wright's medications fell into that category. Even if they did not reach that conclusion, the Policies require that reported verifications (regardless of whether they are verified) be discussed with a provider within one day for a

decision on whether or not to continue the medications. (Wellpath Policies at WELLPATH E09A-000002, Ex. 45 to Resp. Exs.).  Even for medications that are not considered "High Priority," the Medication Verification Policy provides that all medications "should generally be initiated within 48 hours of notification of the mediation," and that the provider can continue the medication verification process for a total of three business days. (*Id.* at WELLPATH E09A-000002–03).  In sum, the Policies plausibly provide a basis for a jury to find that a different course of action was required by Wellpath policy than that which the individual Wellpath Defendants followed.  While the employees' failure to follow Wellpath's policy does not necessarily lead to a finding that the employees were deliberately indifferent in their failure to call, this conclusion, along with the evidence described below, does raise an issue of fact as to whether they were deliberately indifferent.

The Wellpath Defendants also argue that Plaintiffs provide no evidence to support a finding that a phone call would have been a reasonable measure because they fail to show that verification of Wright's medications over the phone would have been possible with the incorrect birthdate.  They essentially contend that, even if they had called Mountain View Hospital to verify Wright's diagnosis and medications, they would have encountered the same issue they did with the ROI: HIPAA would prevent the hospital from disclosing information about a patient when Wellpath did not have Wright's correct birthdate. (Wellpath Reply 3:15–28).  While the Wellpath Defendants claim that there is no evidence that they were at fault for the incorrect birthday, and no evidence that they could have identified the correct birthdate, the pre-booking medical sheet and the medical pre-screening form both list Wright's correct birthdate. (Medical Records, Ex. 13 to Resp. Exs.).  Thus, there is evidence to show that Wellpath had records with Wright's correct birthdate.  Further, a jury could conclude that a phone call could more quickly put Wellpath employees on notice that the listed birthdate was wrong.  Viewing this evidence and drawing all reasonable inferences in the light most favorable

to Plaintiffs, the Court finds that Plaintiffs have raised a genuine dispute of fact as to whether each employee Defendant did not take a reasonable available measure to abate the risk presented in Wright's situation.

### i.  Tanja Wasielewski

The only dispute between the parties is whether it would have been a reasonable available measure for Wasielewski to call Mountain View Hospital, rather than send the ROI. In its analysis above, the Court concluded that a genuine issue of facts remains as to whether calling Mountain View Hospital to verify Wright's medications was a reasonable measure. Based on that conclusion, the Court also finds that there is an issue of fact as to whether that measure was available to Waisielewski, because she was the employee who originally sent the ROI to verify Wright's medications.  The Court therefore denies summary judgment on the claim against Wasielewski.

### ii.  Earl Salviejo

The parties disagree on whether it was deliberately indifferent for Salviejo to (1) fail to call Mountain View Hospital, and (2) fail to examine and work Wright up as a CHF patient.  As to the calling issue, having already reached the conclusion that a jury could find that each medical provide should have reasonably called Mountain View Hospital to verify medications, the Court denies summary judgment on that issue.  The Court also concludes that Plaintiffs offer sufficient evidence to raise a genuine issue of fact as to whether the reasonable thing to do in Salviejo's position would have been to examine and provide additional care to Wright as a patient with self-reported heart failure.  Specifically, Plaintiffs point to Williamson's testimony explaining that for a newly booked patient complaining of CHF:

> a midlevel provider in the booking area would provide the initial continuation of any heart disease medications, enrolling them in a chronic care clinic, drawing appropriate labs, getting EKG and x-rays as appropriate for the clinical presentation of somebody with heart disease.

(Williamson Dep. 73:12–20, Ex. 15 to Resp. Exs).  The Wellpath Defendants contend that this testimony is irrelevant because Williamson was discussing a hypothetical patient who is "known to require medical care related to heart disease." (Wellpath Reply 7:13–14).  But they fail to explain how Wright differs from such a patient when he reported during the receiving screening that he had heart failure. (Receiving Screening, Ex. M to LVMPD MSJ).  Thus, the Court finds that Plaintiffs have met their burden of raising a genuine dispute of fact as to whether Salviejo was deliberately indifferent in his decision not to examine and provide care to a patient who reported being hospitalized for heart failure the day prior.

### iii.  Horace Tadeo

Plaintiffs allege that Tadeo was deliberately indifferent to Wright's medical needs because he was on notice of Wright's previous reporting of heart failure and need for medications, failed to verify those medications, and failed to provide any treatment after witnessing worsening symptoms of heart failure. (Resp. 63:1–21).  The Wellpath Defendants first argue that there is no evidence Tadeo actually reviewed all the information from the chart because Plaintiffs provide no evidence for what his written statement "[c]hart reviewed" means. (Wellpath Reply 8:14–16).  But this argument misunderstands the burdens at summary judgment.  Plaintiffs need not provide conclusive evidence that Tadeo in fact reviewed the full chart; instead, they need only identify evidence that raises a genuine dispute of fact as to whether he did.  Here, a reasonable jury could find that Tadeo actually reviewed the substance of Wright's chart based on the written statement "chart reviewed."

The Wellpath Defendants next argue that Plaintiffs improperly submit that Wright complained of his worsening symptoms to Tadeo because he complained of the same to Essix that same day. (Wellpath Reply 8:17–20).  The fact that Wright was complaining of swollen feet to his girlfriend on April 8 and April 10 could support a finding that he was experiencing that symptom on the days Tadeo saw him, and that he therefore could have reported that

symptom.  Further, Tadeo noted that Wright had an irregular heart rhythm and told Tadeo that he was supposed to be taking a water pill. (Medical Records at LVMPD000108–09, Ex. 13 to Resp. Exs.).

Based on the totality of the evidence, viewed in the light most favorable to Plaintiffs, there is a genuine dispute of fact as to whether Tadeo was deliberately indifferent to Wright's medical needs when he saw Wright twice and did not attempt to verify Wright's reported CHF and medications or provide medical treatment.  The Court therefore denies summary judgment on the deliberate indifference claim against Tadeo.

### iv.  David Oliphant

Plaintiffs next argue that there is a dispute of fact as to whether Oliphant was deliberately indifferent when he knew of Wright's recent CHF diagnosis but made a decision to wait for records from Mountain View before providing any medical treatment to Wright. (Resp. 63:23–25).  Once again, based on the findings about the possibility of calling Mountain View Hospital, the Court finds that there is an issue of fact as to whether Oliphant was deliberately indifferent for failing to call.  Further, Plaintiffs point to their expert's statement that the decision to "simply do nothing and wait for records" did not meet the standard of care for a heart failure patient. (Waxman First Supp. Report at 2, Ex. 6 to Resp. Exs., ECF No. 107-6).

The Wellpath Defendants argue that Plaintiffs provide no evidence to show Oliphant knew or could have known of the severity of Wright's heart problem. (Wellpath Reply 9:5–14). This is particularly true because Oliphant noted that Wright reported feeling a lot better since being booked and denied chest pain or shortness of breath. (Medical Records at LVMPD000115–16, Ex. 13 to Resp. Exs.).  The Court agrees that such evidence calls into question whether Oliphant could have been expected to know the severity of Wright's condition, and particularly whether "a reasonable official in the circumstances would have appreciated the high degree of risk involved," which is a required element of Plaintiffs'

deliberate indifference claim. *See Gordon*, 888 F.3d at 1125.  Plaintiffs only identify one expert report disagreeing with Oliphant's decision to "do nothing," but that statement does not address how Oliphant would have appreciated the severity of Wright's condition.  Having pointed to no other evidence regarding Oliphant, Plaintiffs have failed to meet their burden of raising a dispute of fact as to whether a reasonable official in Oliphant's position would have appreciated the risk of the actions he took.  The Court therefore grants summary judgment in favor of Oliphant on the deliberate indifference claim.

### v.  Larry Williamson

Plaintiffs argue that Williamson was deliberately indifferent in his choice to do nothing to provide medical care to Wright upon review of his chart. (Resp. 64:25–65:7).  Defendants explain Williamson acted reasonably because there were no objective signs of the complained problems. (Wellpath Reply 10:5–9).  Williamson explained in his deposition that patients in jail "are not always truthful, and if their findings don't match their statements, then usually we find the objective evidence to be more reliable than the subjective complaints." (Williamson Dep. 64:11–24, Ex. 15 to Resp. Exs.).  But Plaintiffs offer evidence that Wright's chart contained signs of worsening CHF symptoms, including low blood pressure, that could allow a jury to conclude that there was some objective indication of Wright's reported health problems.  Further, based on the totality of the information included in Wright's medical record, a jury could conclude that it was deliberately indifferent for Williamson to decide not to follow up on the ROI from Mountain View Hospital.  Accordingly, the Court denies summary judgment on the § 1983 claim against Williamson.

Plaintiffs also seek to hold Williamson liable as a supervisor.  "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th

Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  This causal connection can be established "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Hyrdick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).  It can also be established by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (quoting *Dubner v. City and Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

Plaintiffs argue that Williamson's supervisor liability is based on the following: (1) he saw from his review of the chart that Wasielewski, Salviejo, Tadeo, and Oliphant failed to verify through a phone call Wright's CHF medications prescribed by Mountain View Hospital; (2) he continued to rely on the Wellpath custom of verifying patient medication by sending an ROI medical records request to Mountain View Hospital and just waiting for a response; and (3) failing to examine Wright and develop a treatment plan to threat the CHF or referring Wright to an outside provider for care. (Resp. 68:1–24).  Wellpath Defendants fail to respond to Plaintiffs argument regarding Williamson's supervisor liability, and therefore fail to meet their burden on negating an essential element on this issue.  The Court therefore denies summary judgment on the § 1983 claim against Williamson.

### vi.   Jay Marcos and Ray Montenegro

Jay Marcos saw Wright on April 19, following multiple heart rate readings in the 130s to 180s and an EKG result of a possible septal infarct.  Plaintiffs contend that the evidence presents an issue of fact as to whether he was deliberately indifference when he did not call a Code 99 medical emergency for Wright to be transferred out of CCDC for emergency room care, set the first available appointment with a provider, or event call Mountain View Hospital to verify Wright's CHF medications. (Resp. 69:24–28).  Nurse Marcos completed a Progress

Note that explained that Wright again reported he was hospitalized in early April and diagnosed with heart failure. (Medical Records at LVMPD000106, Ex. 13 to Resp. Exs.).  He further noted that Wright complained of chest pain, shortness of breath, and abdominal pain. (*Id.*).  Marcos reported to Ray Montenegro who told Marcos to check Wright's vital signs and send out another ROI. (*Id.*).  After Marcos and Montenegro took these actions, no follow up is documented in Wright's chart, and no other RN, NP, PA, or MD saw Wright until he was transferred to UMC.

The Wellpath Defendants argue that Plaintiffs have provided no support a finding that a different course of action would have been medically reasonable.  But as explained above, given the information Marcos and Montenegro were presented with, a jury could find their failure to attempt to verify Wright's medication via phone call to Mountain View Hospital was deliberately indifferent.  Additionally, based on the evidence presented, Plaintiffs have met their burden of raising a genuine dispute of fact as to whether both Marcos and Montenegro were deliberately indifferent in failing to take further steps to either provide or secure medical treatment for Wright.  Accordingly, the Court denies summary judgment on the § 1983 claims against Marcos and Montenegro.

### c.  Special Damages

The Wellpath Defendants next argue that they are entitled to summary judgment on Plaintiffs' special damages because they were untimely and unsupported by reliable expert opinions. (Wellpath MSJ 28:15–32:24).  Plaintiffs do not oppose dismissal of Germaine Carmena's claim for loss of income damages based upon the possibility he would play in the NFL, (Resp. 101:18–20), so the Court only addresses Wright's lost income damages.

The Wellpath Defendants first argue that Plaintiffs did not timely disclose their special damages. (Wellpath MSJ 28:17–30:6).  Under FRCP 26(a), a party must disclose "a computation of each category of damages claimed by the disclosing party" and make available

the documents upon which the computation is based.  Where a party does not have all of the information necessary to provide a computation of damages early in the case, "it has a duty to diligently obtain the necessary information and prepare and provide its damages computation within the discovery period." *Jackson v. UA Theatre Circuit, Inc.*, 278 F.R.D. 586, 593 (D. Nev. 2011).  FRCP 37(c)(1) "gives teeth" to the requirements under FRCP 26 "by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). This rule excludes untimely disclosed information, unless the party's failure to disclose the required information is substantially justified or harmless. *Id.*

Defendants explain that Plaintiffs did not disclose any computation of damages regarding special damages until their Fifth Supplemental Disclosure, which was served on the last day of discovery (February 22, 2024). (Wellpath MSJ 29:25– 28).  In that disclosure, Plaintiffs disclosed lost income in the amount of $287,827–$643,812 and medical expenses in the amount of $1,074. (*Id.* 30:1–3).  Because these special damages were disclosed at the end of discovery, Wellpath Defendants argue that they were prevented from doing discovery on them. (*Id.* 30:3–4).

Plaintiffs do not dispute Defendants' claim that they did not disclose special damages in a computation of damages until the last day of discovery.  Instead, they point out that the loss of earning calculation in the amount of $287,827–$643,812 was disclosed by the initial expert disclosure deadline along with his report detailing the basis for that calculation. (Resp. 101:5– 9).  The initial expert report deadline was November 21, 2023. (*See* Sch. Ord., ECF No. 61). Thus, Plaintiffs explain, Defendants have been on notice of the loss of earning claim and are therefore not prejudiced. (*Id.* 101:9–13).  The Wellpath Defendants do not address this argument, insisting that Plaintiffs failure to disclose the information in a computation of damages earlier is prejudicial. (Wellpath Reply 18:15–17).  They further explain that they had

little reason to conduct discovery into a potential loss of income claim because the Complaint is devoid of any allegation of a loss of earnings or loss of income. (*Id.* 18:18–22). But based on Plaintiffs' undisputed contention that they disclosed the lost income amount and basis for that calculation by the initial expert report deadline, and the computation of damages was also disclosed before the deadline, the Court declines to dismiss the loss of income damages at this juncture. The Court denies the Motion for Summary Judgment on this issue, but does so without prejudice to all Defendants' ability to move for exclusion of evidence that was not timely disclosed in a motion in limine.

### 5. Summary

In sum, the Court grants, in part, and denies, in part, both Motions for Summary Judgment. The Court grants summary judgment in favor of Defendants on the following claims: Plaintiffs' second cause of action (due process against Doe Defendants); Plaintiffs' *Monell* claims against LVMPD for the alleged customs regarding treatment plans, accepting medical information from family and friends, and failure to train; negligence and medical negligence claims against all Defendants, and the § 1983 deliberate indifference claim asserted against David Oliphant.

The case will proceed to trial on several claims. Dana Thomas's Fourteenth Amendment claim for loss of companionship and the Estate of Palmer Wright's Fourteenth Amendment claims will proceed against LVMPD on the following *Monell* theories: Wellpath's custom of verifying medications, its practices regarding responding to kites, and its custom of having inadequate medical staffing. The Estate's § 1983 individual deliberate indifference claims will proceed against the following Defendants: Tanya Wasielewski, Earl Salviejo, Horace Tadeo, Larry Williamson, Jay Marcos, and Ray Montenegro.

Plaintiffs are also granted leave to amend the Complaint only to name the Liquidating Trust as a nominal defendant if they so choose.  Leave to amend does not extend to any other amendments absent the granting of a future motion for leave to amend.

**IV.    CONCLUSION**

**IT IS HEREBY ORDERED** that Wellpath Inc.'s Motion to Dismiss is **GRANTED.** Plaintiffs are granted leave to amend their Complaint to name the Liquidating Trust as a nominal defendant.

**IT IS FURTHER ORDERED** that LVMPD's Motion for Summary Judgment, (ECF No. 79), is **GRANTED, in part, and DENIED, in part**.

**IT IS FURTHER ORDERED** that the Wellpath Defendant's Motion for Summary Judgment, (ECF No. 80), is **GRANTED, in part, and DENIED, in part.**

**IT IS FURTHER ORDERED** that Plaintiffs are granted leave to amend their Complaint in compliance with the instructions in this Order.  Plaintiffs must file an amended complaint within 21 days of the date of this Order.

**IT IS FURTHER ORDERED** that the Parties will have thirty days from the date of filing of the amended complaint to file a jointly proposed pretrial order pursuant to LR 16-3(b) using the form provided in LR 16-4.

**DATED** this __31__ day of March, 2026.

_____
Gloria M. Navarro, District Judge
United States District Court